**Sandra SENTERS, natural mother of deceased, Terry Griffith, Jr., Plaintiff-Appellant,**

v.

**Thomas E. TULL and Owens-Illinois, Inc., Defendants-Appellees.**

Court of Appeals of Tennessee, Eastern Section.

June 25, 1982.

Permission to Appeal Denied by Supreme Court Oct. 4, 1982.

Robert A. Scott of Jenne & Scott, Cleveland, for plaintiff-appellant.

James E. Moffitt and Joe E. Manuel of Leitner, Warner, Owens, Moffitt, Williams & Dooley, Chattanooga, for defendants-appellees.

OPINION

FRANKS, Judge.

In this wrongful death action, at the conclusion of plaintiff-mother's proof, the trial judge directed a verdict in favor of the operator of the motor vehicle which struck decedent child. The trial judge directed the verdict on the narrow ground: "that letting a six-year old child cross a main highway is negligence, and it places a child in a dangerous position." He concluded the mother, being the sole beneficiary of the child's

estate, was barred as a matter of law on the ground of her contributory negligence.

On appeal, the sole issue is whether the evidence creates issues to be submitted to the jury and the familiar rule applicable to our review is we are required to take the strongest legitimate view of all of the evidence in favor of the plaintiff and to assume the truth of all it tends to support, allowing all reasonable inferences and discarding all to the contrary and, if there is any doubt as to the conclusion to be drawn from the evidence, the motion for a directed verdict should be overruled. *Crosslin v. Alsup,* 594 S.W.2d 379 (Tenn.1980).

The incident giving rise to this suit occurred on March 28, 1980, on Highway 74, commonly called Spring Place Road, in rural Bradley County. Decedent was six years and ten months of age at the time of his death. On that date, plaintiff had driven the children from school, turned on to her driveway which was directly opposite her mail box, and stopped her car approximately one and a half car lengths from the road. Her nine-year old daughter stood outside the car while decedent crossed the road to get the mail from the box. Plaintiff observed the child in her rear view mirror. While he was on the opposite side of the road from the vehicle, she heard a horn, "a couple of little beeps". She looked in the rear view mirror and decedent was standing by the mail box with the mail in his hand with the other hand on the mail box. She concluded he was in no danger and her nine-year old spoke to her, gaining the plaintiff's attention. In a matter of seconds, she heard a sound from tires skidding on the road, again looked in the rear view mirror and only saw defendant's vehicle. The child had been struck by the vehicle.

According to the investigating officer, defendant's motor vehicle laid skid marks of 62 feet, decedent's body was 190 feet from the point of impact and defendant's motor vehicle travelled some 278 feet from point of impact. Defendant's statement to the officer was:

I was coming down this way (north). First time I saw him he was at the mail box. I felt he was going to step back. I honked my horn two or three times. He was just starting to turn, I veered to the left. He took two quick steps right in front of my car. He hit on the right front and came up on the hood. The reason I stopped sliding I didn't want him to go up under the car. He fell off the edge of the car. I pulled over onto my side of the road and stopped at a driveway.

Plaintiff-mother testified that her son had completed kindergarten and was in the process of completing the first grade. That from the time he enrolled in kindergarten, the teachers had stressed the parents should encourage their children to be independent, that she was advised by school officials when she had dropped the child off at school she was not to escort him to the sidewalk or sit in the car and observe until he entered the building. She said: "They stress that when they began to go to school they need independence and responsibilities." She further testified she first taught her child to go to the mail box when the mail box was on the same side of the road as their home. After they moved to her present home, the mail box was on the opposite side of the road. She testified as to her training of the child:

I would get out of the car, and they would get out with me. And I'll tell about Terry first since he's the person involved. He would hold my hand. Now, he didn't just walk beside me from the very first day, and he would decide—he would like look both ways, and I would stress that you had to look both ways before you crossed. And he would hold onto my hand, and he would look.

And he would say, "Okay, Mom, we can go."

And I always stressed—of course, you can see half a mile either direction from the side of the road where my car is parked. There is nothing to obstruct your view from that side of the road. Even the curb doesn't, which is 400 feet up the road.

I would always stress: If there is anything coming from either direction you are never to cross. He never, from the very first time I started to teach him, he never once said, "Okay, Mom, let's go," and a car would be coming either direction. He never did. And I always stressed: We never hurry. This is the one time of the day that time is not important.

He would hold my hand, and he would say, "Okay, Mama, we can cross."

We would cross and get the mail out, and he would take my hand again. He would look both ways.

And he would say, "Okay, Mama, we can cross."

.    .    .    .    .

Q. Okay. Now, how long did you personally get out of the car and hold his hand, and that type of training, Mrs. Senters?

A. Several weeks. Once I felt sure that he understood, you know, that you don't cross regardless of if the car is down at the curve, which is a half a mile away—until I felt sure that he understood, he never crossed.

Then, I didn't just turn him loose. I would get out of the car, and I would stand at the back of the car. And he and my daughter would cross together. She would hold his hand, and he would still direct. And this went on for a time until I felt like he was thoroughly trained, he thoroughly understood, and, then, I would permit him—I would get out, and I would stand at the back of my car, and I would watch at the same time he would watch. And he would look both ways, and he would cross.

He never once crossed with traffic coming either direction.

Q. Okay. Now, did you finally get to the point that you had confidence in him to let him get to the mailbox while you stayed in the car?

A. Yes. I normally—up until maybe Christmastime or so, I guess, I went with him or I watched him from the back of the car. And I guess around Christmastime, that was several months, I felt sure of him. Even when I was in the car, I watched him. I watched for two reasons: Number one, to watch him and see that he did look; number two, was to see that he didn't drop anything out of the mailbox in retrieving it.

■ At the outset, we observe that child pedestrian accident cases of this nature usually involve the interrelationship of three issues for the triers of fact determination: the duty of the operator[1] of the vehicle causing the death of the child, the contributory negligence, if any, of the deceased child,[2] and the negligence, if any, of the

1. The duty of the motor vehicle operator is well expressed in 7A Am.Jur.2d 745, § 515:

   A motorist who sees a child near a crossing, or at the edge of and about to cross a street or highway, is required to exercise a high degree of care and caution to avoid injuring him, particularly where he observes that the child is inattentive to the approach of his vehicle. He should under such circumstances maintain a proper lookout and anticipate childish conduct. He may be under a duty to sound a warning of his approach, although the sounding of such warning does not relieve him thereafter from the duty to anticipate childish conduct. Clearly, where a motorist sees a child about to cross a street or highway he should maintain control of his vehicle, and not drive at an unreasonable, excessive, or unlawful rate of speed, but rather should reduce his speed.

2. [T]here should not be fixed arbitrarily any age when an infant is presumed, as a matter of law, to be capable of exercising discretion and care. Some children mature earlier than others; some have natural capacity or better training in habits of thought than others who are older. Moreover, care or lack of care is a thing related to the particular surroundings, simple or complex, of the accident under investigation. It is also easily conceivable that a child nearly seven years of age by reason of living near the scene of the injuries may be better acquainted with and appreciative of the dangers incident to it than some other child of fifteen unacquainted with it.

   Prima facie a child of six is not guilty of contributory negligence, but the defendant is not precluded from insisting that, under the facts disclosed in the particular case, the infant had capacity to be and was negligent. The capacity of the infant is, then, one of fact

child's parent.[3]

The trial judge, in ruling the mother was guilty of contributory negligence as a matter of law, expressly relied on *Smith v. Henson,* 214 Tenn. 541, 381 S.W.2d 892 (1964). The *Smith* case, apart from not involving a pedestrian, is not controlling. In that case, the mother had parked an automobile on a steep grade and permitted her children, ages 2 and 3, to play in the automobile and the car rolled down the steep slope, injuring one child and killing the other. The court said, in concluding the mother was guilty of contributory negligence as a matter of law, the car was parked in a dangerous position, the mother knew the children were playing on the premises without proper supervision and permitted them to get into the parked and unlocked automobile.

Negligence, contributory negligence and proximate cause, as a general rule, are issues to be decided by the jury and can only be withdrawn from the jury and decided by the court in cases where the facts are established by evidence, free from conflict, and the inference from the facts is so certain that all reasonable persons, in the exercise of free and impartial judgment, must agree upon the conclusion. *Frady v. Smith,* 519 S.W.2d 584 (Tenn.1974); *Phillips v. Pitts,* 602 S.W.2d 246 (Tenn.App.1980). Harper and James, in their *Law of Torts,* state the reason for the rule well:

> Contributory negligence, like negligence, must involve a risk that is unreasonable under all circumstances, and this test again generally invokes the jury's function to find and apply the dictates of the community conscience in the matter. vol. 2, § 22.10, p. 1229.

In the early Tennessee case of *Bamberger v. Citizens' Street Railway Co.,* 95 Tenn. 18, 31 S.W. 163 (1895), the Supreme Court held the issue of the parents' contributory negli-

gence, where a three-year old child was struck upon entering the street by a streetcar, was for the jury. *Accord: Bradshaw v. Holt,* 200 Tenn. 249, 292 S.W.2d 30 (1956); *Cheek v. Fox,* 7 Ct.Civ.App. 160 (1917).

A parent's permitting or suffering a child to go upon a street or public way may constitute negligence on the part of the parent; however, on the evidence before us reasonable minds could differ on the issue of whether the mother was guilty of negligence proximately contributing to the child's death.

The judgment of the trial court is reversed and the cause remanded for a new trial, with costs incident to the appeal assessed against the defendants.

PARROTT, P.J., and GODDARD, J., concur.

---

for the jury to pass upon, and not one of law for the court.
*Wells v. McNutt,* 136 Tenn. 274 at 277, 189 S.W. 365 (1916).

**3.** The well established rule is that a recovery will not be allowed when the negligence of

the sole beneficiary thereof proximately contributed to the death for which the recovery is sought.
*Nichols v. Nashville Hous. Authority,* 187 Tenn. 683 at 686, 216 S.W.2d 694 (1949).